## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RADIANT IMAGES, INC, and GIANNA WOLFE<br><br>Plaintiffs,<br><br>v.<br><br>COMPLETE BUSINESS SOLUTIONS GROUP, INC., BROADWAY ADVANCE FUNDING, LLC; JOHN AND JANE DOE INVESTORS,<br><br>Defendants. | Civil Action No.<br><br><br>JURY TRIAL DEMANDED<br><br>**COMPLAINT** |

Plaintiffs Radiant Images and Gianna Wolfe (collectively "Plaintiffs") bring this Complaint and Demand for Jury Trial against Defendants Complete Business Solutions Group ("CBSG"); Broadway Advance Funding, LLC ("Broadway"); and the John and Jane Doe Investors (the "Investor Defendants"), and allege as follows:

### NATURE OF THE ACTION

1.      This is a RICO action seeking, among other things, a temporary restraining order to protect the health and safety of the individual owners, employees and families of Plaintiffs from physical attack and violence from Defendants.

2.      The facts of this case are heinous and have been reported to the proper legal authorities. *See* Ex. A.

3.      On February 15, 2018, Defendants sent an "associate" to Plaintiffs place of business and threatened the lives of Plaintiffs' owners, wives and children if they did not immediately pay Defendants.

4.      The "associate" sent is named Gino Gioe ("Gino").  He entered the premises under the false name Gino Gioelli.  The encounter was recorded by surveillance cameras, which has also been turned over to enforcement authorities:



5.      Gino is a former felon, who did more than ten years in jail for tax evasion, stock fraud, and operating a stolen car ring.  He is physically imposing:



-2-

6.      Upon entry of the premises under a false name, Gino demanded to see Plaintiffs about an alleged business debt that was personally guaranteed by the owners of Radiant Images.

7.      Earlier that day, Defendants CBSG and Fast Advance had learned that Plaintiffs had placed a stop payment on the daily and weekly ACH withdrawals being electronically debited in excess of $60,000 per week.

8.      Gino informed Plaintiffs that placing a stop payment on these federal wire transfers was an "aggressive move," which was the type of moves that place wives and children at risk.  He then told Plaintiffs of a story where he visited a man by the name of "Danny" in Idaho who similarly borrowed a lot of money from Defendants and would not respond to them. He said he went to Idaho, noting that Idaho was the flattest place on earth, the middle of nowhere and as he was proceeding on the highway, he came up to a huge car accident.  He then informed Plaintiffs that when he looked inside the care, it was "Danny."  He then informed Plaintiffs that "these are the kid of things which strongly effect wives and children."  .

9.      Gino then asked one of Plaintiffs' employees about his office hours and how late he works.

10.      Gino then informed Plaintiffs that it was very important to take care of this immediately and asked how much Plaintiffs could pay.  He then said he would call the next day, February 16th, at 9 am.

11.      After Plaintiffs informed Gino that they needed more time, Gino called Joe Macke and placed him on speakerphone.  His real name is Joseph MacElhone and is reputed to have Mafia connections.

12.      Joe Macke answered the call and immediately asked: "Where is my money?"  He admitted that Plaintiffs had previously informed Defendants of their cash flow problems but that

he did not want to hear any excuses, he wanted his money.  He reiterated that "it is a lot of money and he would crush" Plaintiffs.

13.     After a lot of screaming and yelling, Gino left the premises upon request, promising that he "calls all the shots" and nothing would happen until Plaintiffs spoke on Friday, February 16th, 2018.

14.     On the phone call, "Joe Macke" got into a screaming match with one of Plaintiffs employees, ultimately informing the employee that he did not want to deal with this clown anymore, and instructed Gino that he knew what he had to do, and to "take care of him. It's all in your hands now."

15.     After this phone call, this employee purchased a bulletproof jacket and a gun because he is in fear for his life and physical safety.

16.     The other employee who witnessed these events informed Plaintiffs that he liked working for the company but did not want to die.

17.     On February 18th, Plaintiffs reported this incident to the Los Angeles Police Department.

## THE PARTIES

18.     Plaintiff Gianna Wolfe is the co-Founder of Radian Images, Inc., and an adult resident and citizen of Los Angeles, California.

19.     Plaintiff Radiant Images Inc, is a corporation organized and existing under the laws of California, with a principal place of business located at 2702 Media Center Drive, Los Angeles, CA 91016.

20.     Defendant Broadway is a limited liability company organized and existing under the laws of New York, with a principal place of business located at 39 Broadway, Suite 930,

20460284v.1

New York, New York, 10006.  Upon information and belief, Defendant Broadway's members are New York citizens.

21.     Defendant Par Funding d/b/a Complete Business Solutions Group, Inc., is a corporation organized and existing under the laws of Pennsylvania, with a principal place of business located at 20 N. 3rd St., Philadelphia, PA 19106.

22.     On information and belief, each of the John and Jane Doe Defendants are investors in Broadway and each are citizens of New York, New Jersey or Pennsylvania.

## JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Radiant Images' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S.C. §§ 1961–68.  The Court has subject-matter jurisdiction over Plaintiffs' state-law claims because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

24.     Additionally, this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorney's fees.

25.     The Court further has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy exceeds $75,000 exclusive of interest and costs, and Plaintiffs are citizens of a State different defendants and none of the exceptions to that section apply.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

27.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly transacts business within the State of New York, and/or has purposefully availed himself of the jurisdiction of this Court for the specific transactions at issue.

## FACTUAL BACKGROUND

**A.     The MCA Industry.**

28.     The Defendants are part of the Merchant Cash Advance Industry (MCA"), which preys upon small, financially distressed businesses throughout the United States and fraudulently induce them into advances pursuant to so-called future account receivable purchase agreements or merchant case advance agreements.

29.     The terms and conditions of these agreements are wholly inaccurate, and knowingly designed and/or used by the Defendants to deceive the small businesses and others into believing the agreements do not contemplate a loan transaction so that they do not trigger the criminal usury laws of various states.

30.     When Plaintiffs and other small businesses cannot meet their obligations under these agreements, Defendants offer new advances under even more unconscionable terms.

31.     Eventually, the terms become too oppressive, the small businesses default, and the Defendants aggressively pursue the small businesses and their owners for repayment of the amounts due under the agreements, often employing threatening, deceptive and illegal collection tactics.

32.     In the end, Plaintiffs and other the small businesses face certain financial ruin while the Defendants recover not only the principal advanced, but also interest at rates that often criminal usury thresholds.

**B.      Radiant Images, Inc. and Wolfe.**

33.      Radiant Images is an award winning service provider to the motion picture industry located in Los Angeles, California.

34.      For more than 10 years, it has provided motion picture companies with 2D, 3D, VR, and augmented reality solutions and access to various specialized equipment through its rental services.

35.      In as early as 2015, Radiant was suffering financial difficulties and it needed to quickly obtain additional financing in order to meet its daily operating needs and expand its business.

36.      In or around this time, CBSG contacted Radiant to determine if Radiant was in need of cash for its business.

37.      Once apprised of Radiant's need, CBSG brokered a series of loans (collectively, the "Transactions") between Broadway, Fast Advance, and Plaintiffs (collectively, the "Agreements") from 2015 until January 2018. A sample copy of Plaintiffs' Agreements with Broadway is attached hereto as Exhibit A.

38.      Pursuant to the Agreements, Broadway advanced a specified amount of funds (the "Purchase Price") to Radiant in exchange for the purported purchase of ***all*** of its future accounts receivables and the proceeds thereof (the "Receipts") until a specified amount (the "Purchased Amount") was remitted to CBSG or Broadway via daily ACH withdrawals of specified amounts (defined as the "Daily Specific Amount" or "Weekly Specific Amount") from Radiant's bank account (the "Bank Account").

20460284v.1

39.     Thus, at the inception of each Agreement, Broadway anticipated repayment of the Purchased Amount within a specified term determined by the number of daily or weekly payments required for full repayment thereof – just like a loan.

40.     To secure performance of the daily or weekly withdrawals, Radiant granted Broadway a security interest in certain of its assets and Wolfe was required to personally guarantee Radiant's performance of the representations, warranties and covenants under the Agreements.

41.     When Plaintiffs could not make the daily or weekly payments required by the Agreements, CBSG, Broadway, or Fast Advance would offer the Plaintiffs new advances under similarly onerous terms and use the proceeds to pay off the old advances, leaving the Plaintiffs with little "new cash" under the new Agreement and launching the Plaintiffs into a never ending spiral of debt from which Defendants knew the Plaintiffs could never come out of.

42.     In reality, the unconscionable Transactions are an unscrupulous pyramid scheme, whereby the Plaintiffs were pushed toward an unsustainable level of indebtedness in a relatively short period of time, creating circumstances under which the Defendants could then go after not only the assets of Radiant, but also the personal assets of Wolfe.

**C.      The Agreements are disguised loans.**

43.     Although documented as the purported purchase of receivables, the Transactions were in form, substance and every conceivable way, loans.

44.     When viewed as what they truly are, loans, the Agreements charge usurious amounts of interest, often exceeding New York's criminal usury threshold. *See* Exhibit B, attaching the interest calculation for the January 17, 2018 loan.

### a. The "Daily Specified Amount" is a disguised, fixed, loan payment

45.      The Agreements required Plaintiffs to make daily or weekly payments to Broadway, purportedly based on a specified percentage of Plaintiffs' daily receivables.

46.      This "Specified Daily Amount" or "Specified Weekly Amount" is allegedly based on a good-faith estimate of Plaintiffs' daily future receivables, but, in reality, it is a knowingly false term unilaterally dictated by Broadway in an attempt to avoid usury laws. In fact, the payment is based on the value of the loan, not Plaintiffs' daily receivables.

47.      Plaintiffs were required to pay the "Specified Daily Amount" or "Specified Weekly Amount" until Broadway received the "Purchased Amount" in full.

### b. The "Purchased Amount" is the disguised repayment of principal and interest

48.      The purported "Purchase Amount" of the receivables is also complete fiction. In each of the Agreements, Broadway represents that the "Purchased Amount" is tied to the value of the purchased receivables. In reality, however, the alleged fair market value was unilaterally dictated by Broadway based on the creditworthiness of the merchant.  In contrast, true factoring agreements determine the fair market value of the receivable based on the credit worthiness of the customer expected to pay the receivable.

49.      Furthermore, the Agreements are not tied to specific and existing contracts for goods already delivered by the merchant to a customer.  In other words, the right to repayment is not tied to the value or money owed to Plaintiffs based on goods or services already provided to a customer who has not yet paid, but instead is based on any and all future receivables based on the sale of goods or services by Plaintiffs until the "factoring agreement" was paid in full. By definition, these terms do not constitute a factoring agreement, but rather a loan, and a usurious one at that.

### c. *The Agreements provided for full recourse in the event of a default or bankruptcy.*

50.     Unlike a true factoring agreement, the terms of the Agreements provided for absolute payment from the Plaintiffs.

51.     If the Plaintiffs were ever to miss a payment, they would be in default and CBSG and/or Broadway would be entitled to confess judgment against the Plaintiffs.

52.     The Agreements allowed for up to four nonsufficient fund fees of $75 before default would occur.

53.     In order to obtain the loans, Radiant was required to grant to CBSG and/or Broadway "a security interest in (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory … now or hereafter owned or acquired by SELLER/MERCHANT and (b) all proceeds, as that term is defined in Article 9 of the UCC . . . "

54.     The security agreement further provided that, upon default, Broadway "may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing, whether by acceleration of otherwise."

55.     Wolfe was also required to personally guarantee performance of the representations, warranties and covenants under the Agreements.

56.     Further, should Plaintiffs ever enter bankruptcy, the Agreements provided "Protections 2 [confession of judgment] and 3[enforcement of security interest in collateral] are immediately invoked."

### D.     <u>Collection of the Agreements</u>

57.     In or around January 2018, Plaintiffs came to the realization that they would soon have trouble making payments to Defendants.

20460284v.1

58.     To prevent this from occurring, Radiant reached out to Defendants numerous times to request that the required daily payment be lowered.

59.     In fact, Plaintiffs specifically provided Defendants with a copy of Radiant's business accounts to show Defendants that they did not have sufficient cash flow to make their daily and weekly payments.

60.     In response to each of Radiant's requests, Defendants essentially brushed off the request, suggesting that the parties "talk next week."

61.     Ultimately, Radiant became unable to make payments on the Agreements on or around February 15, 2018.

62.     In response, Defendants began a vicious campaign where Defendants proceeded to threaten the lives of Radiant's founders and the reputation of the business.

63.     First, Defendants sent a physically imposing, former federal-prison inmate with reputed Mafia ties to Radiant's offices.

64.     The enforcer, knowing the illegal nature of his impending actions, signed into Radiant's building using a false name.

65.     The enforcer then spoke co-founder of Radiant, Michael Mansouri ("Mansouri"), and made veiled threats against Mansouri and Wolfe's lives.

66.     The enforcer told Mansouri that in deciding to cease payments to Defendants, Wolfe and Mansouri made a decision that "affects wives and children."

67.     The enforcer then proceeded to tell Wolfe and Mansouri the story of another business owner who was unable to make payments to Defendants. The enforcer stated that he was driving to the debtor's business and came across an accident that just so happened to have involved the debtor.

-11-

68.     From this conversation, Wolfe and Mansouri inferred that the debtor's accident was related to the debtor's missed payments to Defendants.

69.     Most shockingly, on February 16, 2018, Joe McElhone, CBSG's client services manager, allegedly told the enforcer that he was done with this clown and to "take care of him."

70.     As a result of these threats against their lives, Wolfe and Mansouri immediately filed a report with the Los Angeles Police Department, informing the police that they were scared for their lives.

71.     These threats have also affected Radiant's employees; they have stated that while they love working for Radiant, they do not love it enough to be killed for it.

72.     In addition to the threats made to Wolfe's and Mansouri's well-being, harassed Radiant's customers and business associates.

73.     When no additional payments were received, CBSG notified Radiant's customers and non-customers to inform them of the debt.

74.     On February 16, 2018, CBSG sent Radiant's customers an email that stated:

> We have purchased the future receivables for Radiant Images Inc.
> DBA HD Camera Rentals. Please see the attached correspondence
> which details said transaction. Despite our contractual agreement,
> Radiant Images Inc. DBA HD Camera Rentals has since defaulted
> on their payment. Accordingly, per UCC 9-406, please allow this
> correspondence to serve as a request that you hold all funds
> payable to Radiant Images Inc. DBA HD Camera Rentals in
> reserve until $2,651,880.22 is accrued.

*See, e.g.*, Exhibit C, attaching CBSG's email.

75.     The email also contained a notice, purportedly prepared by CBSG's attorney, that indicated that all payments should be forwarded to CBSG. *See, e.g.*, Exhibit 3, attaching CBSG's notice.

20460284v.1

76. Further, CBSG informed at least 19 other members of the American Society of Cinematographers, an invitation only organization where only directors of photography and special effects experts with distinguished credits were asked to join, of Radiant's debt.

77. The American Society of Cinematographers, however, is not one of Radiant's account debtors. Upon information and belief, this communication was sent either (1) without conducting any due diligence in determining if the organization was an account debtor, or (2) solely to embarrass Radiant and force them to make additional payments on the agreements.

78. As a result of these notices and emails, has lost profits and clients and has had its reputation within the industry significantly harmed.

## DAMAGES

79. As a direct and proximate result of the financial strain resulting from each usurious loan made by Defendants, Plaintiffs were forced to enter into additional usurious loans with CBSG or Broadway to stay afloat.

80. As a direct and proximate result of each of these loans, Plaintiffs paid interest in excess of that allowed by California law (10% or 5% plus the applicable Federal Reserve Rate).

81. As a direct and proximate result of each of these loans and the CBSG Enterprise's subsequent collection tactics, Plaintiffs suffered indivisible injury through lost profits.

## FIRST CAUSE OF ACTION
### Usury

82. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

83. Defendants have violated New York's usury laws.

84. As noted by a New York appellate court, the usury statutes are designed to protect victims from loansharking, "one of the most heinous, virtually bloodsucking, criminal activities of all times." *Hammelburger v. Foursome Inn*, 76 A.D.2d 646, 649-650 (2d Dep't 1980).

85.     Defendant knowingly and intentionally violated N.Y. Penal Law § 190.40 by charging an outrageous interest rate more than twice the 25% maximum interest rate permitted under the criminal laws of this State.

86.     The Agreements set forth a collateralized loan transaction.

87.     Because the Loan Agreements are criminally usurious loans in violation of N.Y. Penal Law § 190.40, the transaction, including all related instruments, are therefore unenforceable as a matter of law.

88.     Defendants have also violated California's usury laws.

89.     Broadway has devised and engaged in a scheme to fund, issue, and collect usurious loans, masked as "merchant agreements" or "factoring agreements," to cash-strapped business.

90.     Radiant has taken usurious loans from Broadway, under the direction of CBSG, and Wolfe has personally guaranteed these debts.

91.     Broadway is not exempt from the prohibitions of California's usury laws, nor are the transactions that are the subject of this action exempt from California's usury laws.

92.     The interest charged by Defendant in connection with these transactions is in excess of the maximum interest rates permitted by California's criminal threshold for usury under Stats. 1919, p. lxxxiii, § 2; and Stats. 1919, p. lxxxiii, § 3 and Article XV, § 1 of the California Constitution, (the higher of 10%, or 5% plus the prevailing rate of the Federal Reserve Bank).

93.     The terms of the Agreements (including, but not limited to, the "Daily Specified Amount" and Suess' personal guarantee) indicate that Radiant's obligation to pay the interest was absolute.

20460284v.1

94.     As set forth above, Broadway willfully intended to enter into the usurious transactions.

95.     As a direct and proximate result of Broadway's disguised loans, Plaintiffs have incurred substantial injury to their business as they have been forced to pay a usurious amount of interest.

## SECOND CAUSE OF ACTION
### Fraud

96.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if fully set forth herein.

97.     CBSG and Broadway intentionally misrepresented the true nature of the transactions in order to avoid application of New York's and California's criminal laws.

98.     CBSG and Broadway knowingly misrepresented that the disguised loans were enforceable when they were illegal under law by, *inter alia*, emailing Plaintiffs copies of the Agreements, requesting that Plaintiffs execute the Agreements and requesting that Plaintiffs authorize Broadway to make daily withdrawals of the Daily Specific Amount from the Bank Account, all of which created the false impression that the Agreements are legally enforceable and that Plaintiffs are obligated to repay when they were not.

99.     CBSG and Broadway obtained Plaintiffs written authorization to collect on the Agreements via daily ACH withdrawals from the Bank Account and Broadway collected upon these illegal contracts via ACH withdrawals from the Bank Account, which created the false impression that the Agreements are legally enforceable and that Plaintiffs are obligated to repay when they were not.

100.    These false impressions were material, and Plaintiffs did not reasonably know that the contracts were illegal.

101.   In addition, Broadway falsely represented the market value of the future receivables that Broadway purported to purchase in each of the Agreements.  This stated value was not based on any true market value assessment but rather was a knowingly false representation unilaterally made by Broadway in order to disguise the true nature of the Transactions.

102.   CBSG and Broadway's misrepresentations were intended to induce reliance because if Plaintiffs were aware that (1) the Agreements were illegal and (2) the market value of the receipts were incorrect, Plaintiffs would not have executed the documents and entered into the Transactions.

103.   CBSG and Broadway knew that the representations were false at the time they were made.

104.   CBSG and Broadway made these representations with the intent to deceive Plaintiffs and with the intent to avoid the criminal usury laws.

105.   Plaintiffs reasonably relied upon these knowingly false representations to their detriment, as it executed the Agreements and was forced to pay interest in excess of New York's and California's criminal usury threshold.

106.   Plaintiffs were directly and proximately damaged by CBSG and Broadway's knowingly false representations by paying interest and principal on criminally usurious loans for which they had no legal obligation to repay.

107.   The conduct of CBSG and Broadway was intentional, outrageous and in reckless disregard of the Plaintiffs' rights.

-16-

### THIRD CAUSE OF ACTION
### Violation of 18 U.S.C. § 1962(c)

108.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

**A.    Culpable Persons**

109.    CBSG is a limited liability company capable of holding a legal interest in property and are thus "persons" within the meaning of 18 U.S.C. § 1962(c) as the term is defined by 18 U.S.C. § 1961(3).

**B.    The Association-in-Fact Enterprise**

110.    The Investor Defendants, Fast Advance, CBSG, and Broadway are separate individuals or entities associated with each other by shared personal and/or one or more contracts or agreements for the purpose of originating, underwriting, servicing and collecting usurious loans to the Plaintiffs and countless other small businesses throughout the United States.

111.    This association of the Investor Defendants, Fast Advance, CBSG, and Broadway constitutes a single association-in-fact enterprise (the "Lending Enterprise") within the meaning of 18 U.S.C. 1962(c), as the term is defined in 18 U.S.C. 1961(4).

112.    Upon information and belief, the members of the Lending Enterprise have functioned as a continuing unit for at least the past two years.

113.    The Lending Enterprise has an existence separate and apart from the illegal activity in which it engages by entering into legal financing agreements and attempting to collect lawful debts using legal collection practices.

**C.    The Defendants' distinct roles in the Enterprise.**

114.    Each of the members has a distinct role in the Lending Enterprise.

115.    The John and Jane Doe Investors provide capital for investment by the Lending Enterprise in lawful and unlawful loans, including the Agreements.

20460284v.1

116.   CBSG acted as a broker for the Lending Enterprise, soliciting borrowers, including the Plaintiffs, obtaining necessary underwriting information for use by Broadway and CBSG in underwriting the lawful and unlawful loans and assisting the collection of the lawful and unlawful loans by obtaining the borrowers authorization to effect daily ACH withdrawals from specified bank accounts, and directed the affairs of the Lending Enterprise.

117.   Fast Advance underwrites, funds, services, and collects lawful and unlawful loans on behalf of the Lending Enterprise including the Agreements.

118.   Broadway underwrites, funds, services, and collects lawful and unlawful loans on behalf of the Lending Enterprise including the Agreements.

**D.      Engagement in Interstate Commerce**

119.   The Lending Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

120.   Specifically, the members of the Lending Enterprise maintain offices in New York and Pennsylvania and use personnel in these offices to originate, underwrite, fund, service and collect on loans made by the Lending Enterprise to borrowers- in California and throughout the United States via the extensive use of interstate emails, telephone calls, wire transfers and bank withdrawals processed electronically through an automated clearing house.

121.   In the present case, all communications between the Lending Enterprise and Plaintiffs were by interstate email, telephone calls, wire transfers or other interstate wire communications. Specifically, the Lending Enterprise used interstate emails and telephone calls to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements, and collect the Daily Specific Amount via electronic interstate withdrawals processed through an automated clearing house.   Additionally, the Lending Enterprise used

interstate email communications to attempt to collect when the Plaintiffs were unable to make the daily payments under the Agreements.

**E.      Conducting Affairs through a Pattern of Racketeering.**

122.     CBSG conducted the affairs of the Lending Enterprise or participated in the affairs of the Lending Enterprise, directly or indirectly, though a pattern of racketeering activity (wire fraud) in violation of 18 U.S.C. 1962(c).

123.      Beginning no later than in or around September, 2014 and continuing today, CBSG devised and carried out a scheme to conduct the affairs of the Lending Enterprise to intentionally defraud borrowers in California and throughout the United States, including the Plaintiffs, to enter into and make payments on criminally usurious loans for which they had no legal obligation to pay and to intentionally defraud others into satisfying such loan obligations when a borrower defaulted.

124.     Since Fast Advance, CBSG and Broadway are each web-based companies that conduct virtually all of their business through the internet, email communications, telephone calls, and wire transfers, it was reasonably foreseeable that interstate emails, telephone calls, and wire transfers would be used in furtherance of the scheme, and, in fact, intestate emails, telephone calls and wire transfers are used in furtherance of the scheme.

125.     Specifically, CBSG directed, approved or ratified, Fast Advance's and Broadway's use of the internet, interstate email, telephone calls, and other communications to intentionally defraud borrowers in California and throughout the United States, including the Plaintiffs, to enter into and make payments on criminally usurious loans for which they had no legal obligation to pay.

126.   As part of this scheme, by the use of interstate emails and telephone calls, BCSG targets and solicits cash-strapped businesses upon which to pawn of usurious loans funded by Fast Advance or Broadway.  These interstate emails and telephone calls intentionally create the false impression that the usurious loans are legally enforceable by:

(i)  misrepresenting the true nature of the loan transactions as receivable sales in order to avoid applicable criminal usury laws;

(ii)  falsely representing that disguised loan contracts are enforceable when they are illegal under New York and California or other applicable law;

(iii)  advising the illegal loans would be funded through interstate wire transfers; and

(iv)  directing all loan repayments to be made by electronic interstate bank withdrawals via an automated clearing house.

127.   Once the loans are approved by Fast Advance or Broadway, Fast Advance, or Broadway further the scheme by using interstate wires to fund the unlawful loans and electronic interstate bank withdrawals to repay the amounts advanced under the disguised loans, all of which further create the impression that the usurious loans are legally enforceable contracts which CBSG, Fast Funding, and Broadway know to be false.

128.   If a borrower defaults, CBSG, Fast Advance, and Broadway use interstate emails and telephone calls to once again fraudulently induce the borrowers to obtain new advances under loans funded by Fast Advance and Broadway that CBSG, Fast Advance, and Broadway know misrepresent the true nature of the transaction in an effort to evade applicable usury laws and create the false impression that the contracts are legally enforceable when they are not thereby inducing the borrowers to enter into and make payments on new usurious agreements to pay off the obligations under the old ones.

-20-

20460284v.1

129.    Upon information and belief, borrowers in California and throughout the United States, like the Plaintiffs, reasonably rely upon these knowingly false representations in order to enter into and make payments on criminally usurious loans.

130.    In the present case, through a series of interstate emails  beginning in September 2017, CBSG solicited Plaintiffs, and, upon approval by Broadway and Fast Advance, provided Plaintiffs with a copy of the several Agreements which CBSG asked that Plaintiffs execute, together with a form authorizing CBSG to electronically withdrawal the daily payments from Radiant's Bank Account.  CBSG's actions were intentionally designed to and, in fact did, create the impression that the Agreements were legally enforceable contracts which Broadway, Fast Advance, and CBSG knew to be false.

131.    Fast Advance and Broadway furthered the scheme by funding the Agreements through an interstate wire transfer and thereafter withdrawing the Daily Specific Amount due under the Agreements by electronic interstate withdrawals processed through an automated clearing house, all of which was intentionally designed by CBSG, Fast Advance, and Broadway to and, in fact did, create the impression that Agreements were legally enforceable contract which they knew to be false.

132.    The scheme continued long after 2015.  Whenever the Plaintiffs could no longer make the daily payments under an Agreement, CBSG, Fast Advance or Broadway, used similar emails and wire communications to intentionally create the false impression that each successive disguised loan was a legally enforceable contract in order to induce the Plaintiffs to enter into and make payments on the criminally usurious loans.

-21-

133.    Plaintiffs reasonably relied upon these knowingly false representations to their detriment, as they executed each of the Agreements and were forced to pay interest in excess of California's criminal usury threshold.

134.    When the payments ultimately became too much and the Plaintiffs could no longer make any payments under the Agreements, CBSG used interstate emails and telephone phone calls on or about February 15, 2018 to give Plaintiffs customers the impression that Defendants had an enforceable debt, and that payments due to Plaintiff should be forwarded to CBSG.

135.    CBSG's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343 which is "racketeering activity" as defined by 18 U.S.C. 1961(1).   Its repeated and continuous use of such conduct to participate in the affairs of the Lending Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**F.     Conducting Affairs Through the Collection of Unlawful Debt**

136.     The Agreements between Plaintiffs and Fast Advance, CBSG, and Broadway constitute unlawful debt within the meaning of 18 U.S.C. 1962(c) because (1) they violate applicable criminal usury statutes, and (2) the rates are more than twice the legal rate.

137.    Upon information and belief, the rates charged by these Agreements were more than twice  New York's criminal usury threshold.

138.    CBSG conducted the affairs of the Lending Enterprise or participated in the affairs of the Lending Enterprise, directly or indirectly, though the collection of this unlawful debt in violation of 18 U.S.C. 1962(c).

139.    Specifically, CBSG, Fast Advance, and Broadway obtained Plaintiffs' authorization to electronically withdrawal payments on an unlawful debt from Radiant's bank account.

140.    Upon receipt of such authorization, CBSG, Fast Advance, and Broadway did, in fact, make the daily withdrawals required by the Agreements.

141.    When Plaintiffs no longer could make the daily payments required under the Agreements, on February 15, 2018, called and emailed Plaintiffs and their customers, and sent an enforce to Plaintiffs business to attempt to persuade Plaintiffs to make additional payments.

**G.    Injury**

142.    As a direct and proximate cause of CBSG's violation of 18 U.S.C. § 1962(c), Plaintiffs suffered, and continue to suffer, substantial injury to their business and/or property as Plaintiffs were forced to pay usurious amounts of interest and have lost, and will continue to lose, profits.

143.    Accordingly, Plaintiffs seek an Order: (i) declaring each of Plaintiffs' agreements with the Defendants to be void and unenforceable; (ii) permanently enjoining the Defendants from collecting on any further usurious loan agreements; (iii) requiring the Defendants, jointly and severally, to repay Plaintiffs all interest previously paid in excess of the applicable usury rate, including prejudgment interest; (iv) awarding punitive damages and/or treble damages as the Court deems appropriate; and (v) requiring the Defendants, jointly and severally, to pay Plaintiffs' and attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**
**Violation of 18 U.S.C. § 1962(d)**

144.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

145.    Each of the Defendants conspired in violation of 18 U.S.C. § 1962(d) to conduct or participate in the affairs of the Lending Enterprise through a pattern of racketeering activity and the collection of an unlawful debt.

20460284v.1

146.     Specifically, through emails, meetings, telephone calls or other communications, each of the Defendants were in agreement that CBSG, Fast Advance, and Broadway would: (i) use wire communications to falsely represent the nature of the agreements between CBSG, Broadway and their borrowers, including the Agreements; (ii) fraudulently induce borrowers, including the Plaintiffs, to enter into transactions such as the Agreements that disguised the true nature of the transactions in order to avoid application of criminal usury laws in California, New York and other states; (iii) fund usurious loan transactions between CBSG, Broadway and their borrowers, including the Agreements, and (iv) collect or facilitate in the collection of unlawful debt, including the loans advanced to the Plaintiffs under the Agreement.

## FIFTH CAUSE OF ACTION
### Violation of California Business & Profession Code § 17200

147.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

148.     California Business & Profession Code §§ 17200, *et seq*. ("UCL") prohibits "unfair competition" in the form of any unlawful, unfair, or fraudulent business act or practice.

149.     Since at least 2015, the Defendants have engaged in unlawful business practices as prohibited by the UCL by, and as further described in this Complaint:

> a.   Violating Cal. Const. Art. XV § 1 by charging interest rates in excess of 10% or 5% plus the applicable Federal Reserve rate;
>
> b.   Violating 18 U.S.C. § 1343 by furthering their scheme to defraud Radiant by (i) making and receiving wire transfers, and (ii) using wires to transmit fraudulent communications;
>
> c.   Violating 18 U.S.C. § 1692(c) by conducting the Lending Enterprise through a pattern of racketeering and the collection of an unlawful debt; and
>
> d.   Tortiously interfering with Radiant's contracts with his customers.

150.     The Defendants have engaged in these actions to further their business activities, i.e. the funding, issuing, and collection of debts.

151.    As a direct and proximate result of the Defendants' violations of the UCL, Plaintiffs have suffered, and continue to suffer, substantial injury to their business and/or property as they were forced to pay usurious amounts of interest and have lost, and will continue to lose, customers, profits, goodwill, and business value.

## SIXTH CAUSE OF ACTION
### Contract

152.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

153.    The Agreements provide: "'[i]n the event that court determines that [Defendant] has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and [Defendant] shall promptly refund to Merchant any interest received by Funder in excess of the maximum lawful rate, it being intended that [Defendant] not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law."

154.    Each of the transactions set forth above are loan transactions.

155.    Plaintiffs have paid, and Defendants CBSG and Broadway have received, interest in excess of the maximum civil usury interest rate allowed by California law.

## SEVENTH CAUSE OF ACTION
### Tortious Interference

156.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

157.    Plaintiffs had an existing relationship with their clients.

158.    The Defendants had knowledge of Plaintiffs' relationships and contracts with their customers.

20460284v.1

159.     The Defendants intentionally interfered with these relationships and procured the breach of Plaintiffs' contracts by requesting that Plaintiffs customers forward all payments to CBSG.

160.     This request, however, was without justification because CBSG was aware that the contracts in which they purportedly purchased the receivables were unenforceable.

161.     Plaintiffs' relationships and contracts with its clients were actually interfered with as the Defendants' communications caused Plaintiffs to experience a drop in clientele.

162.     As a direct and proximate result of the Defendants' tortious interference, Plaintiffs have suffered, and continue to suffer, damages as Plaintiffs have and will continue to lose customers, profits, goodwill, and business value.

163.     Accordingly, Plaintiffs seek an Order: (i) declaring the Defendants' conduct to be unlawful; (ii) permanently enjoining the Defendants from engaging in the unfair, unlawful, and deceptive conduct described above; (iii) requiring the Defendants, jointly and severally, to pay compensatory damages in an amount to be determined at trial; (iv) awarding punitive damages and/or treble damages as the Court deems appropriate; and (v) requiring the Defendants, jointly and severally, to pay Plaintiffs' attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Radiant Images, Inc., and Gianna Wolfe, respectfully request that this Court enter an order:

A.     Declaring that Defendants' actions, as set out above, constitute violations of California Stats. 1919, p. lxxxiii, § 2; and Stats. 1919, p. lxxxiii, § 3 and Article XV, § 1 of the California Constitution, N.Y. Penal Law § 190.40, the Racketeer Influenced and Corrupt

Organizations Act (as against the Defendants only), and California's Unfair Competition Law, as well as breach of contract, and tortious interference with contract;

      B.      Awarding injunctive and other relief as is necessary to Plaintiffs;

      C.      Awarding actual and compensatory damages to Plaintiffs, in an amount to be determined at trial;

      D.      Awarding Plaintiffs pre-judgment interest;

      E.      Awarding Plaintiffs treble and/or punitive damages;

      F.      Awarding Plaintiffs their reasonable litigation expenses and attorneys' fees and costs;

      G.      Awarding such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiffs demand a trial by jury for all claims that may be so tried.


Dated: February 19, 2018                **WHITE AND WILLIAMS LLP**

                                     BY: /s/ Shane R. Heskin
                                         Shane R. Heskin
                                       7 Times Square, Suite 2900
                                       New York, NY 10036-6524
                                       (215) 864-6329
                                       heskins@whiteandwilliams.com
                                       *Attorneys for Plaintiffs*